## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re WINTER STORM URI NATURAL GAS LITIGATION | Case No. 24-1073-DDC-ADM |
| | CONSOLIDATED CASES |
| MEHL, et al. | |
|     Plaintiffs, | |
| v. | Case No. 23-1192-DDC-ADM |
| BP ENERGY CO., et al., | |
|     Defendants. | |
| STONEBERGER, et al., | |
|     Plaintiffs, | |
| v. | Case No. 23-1195-DDC-ADM |
| BP ENERGY CO., et al., | |
|     Defendants. | |
| REBEIN, et al., | |
|     Plaintiffs, | |
| v. | Case No. 23-1245-DDC-ADM |
| BP CANANDA ENERGY MARKETING CORP., et al., | |
|     Defendants. | |

DEUTSCHER, et al.,

     Plaintiffs,

v.

TENASKA MARKETING VENTURES,
et al.,

     Defendants.

Case No. 23-1249-DDC-ADM

RICE, et al.,

     Plaintiffs,

v.

SOUTHWEST ENERGY, L.P., et al.,

     Defendants.

Case No. 24-1005-DDC-ADM

## <u>MEMORANDUM AND ORDER</u>

This case asks the court to decide who gets to hold natural gas companies accountable for elevated prices during an extreme weather event.

In February 2021, Winter Storm Uri pummeled Kansas and other states in the region with severely cold temperatures. On February 14, 2021, Kansas Governor Laura Kelley declared a state of emergency, noting the stress on energy infrastructure and urging Kansans "to conserve energy . . . [to] ensure a continued supply of natural gas and electricity and keep their own personal costs down."[1] Nonetheless, natural gas prices spiked. And now, those price spikes have made their way to consumers' natural gas bills. Plaintiffs, residential consumers of natural

---

[1]     *See Governor Laura Kelly issues state of disaster emergency*, KWCH (Feb. 14, 2021, 6:38PM), https://www.kwch.com/2021/02/15/governor-laura-kelly-issues-state-of-disaster-emergency/.

gas in Kansas, contend that's not right.  They argue that defendants profiteered from the weather

disaster and sold natural gas at exorbitant prices in excessively one-sided transactions, thus

violating the Kansas Consumer Protection Act (KCPA).  Defendants are natural gas companies

who sold natural gas to Kansas distributors, who then sold that gas to plaintiffs at retail, in

February 2021.

Plaintiffs filed five separate Complaints.[2]  Each Complaint represents a distinct

geographical region in Kansas—with each region having its own natural gas distributor—

resulting in five putative residential classes differentiated by distributor:  the Kansas Gas Service

(KGS) residential class, the Kansas Municipal Gas Agency (KMGA) residential class, the Black

Hills residential class, the Midwest Energy residential class, and the Atmos residential class.[3]

Given the considerable overlap in underlying allegations, the court consolidated the five actions.

Doc. 1 at 3.  Defendants include fourteen natural gas producers or suppliers.  Each one supplied

natural gas to one or more of the five distributors during February 2021.[4]

---

[2]    The five constituent cases in this consolidated action are styled as follows, accompanied here by
their respective case numbers and the docket entry of each operative Complaint:  (a) *Mehl, et al. v. BP
Energy Company, et al.*, Case No. 23-1192-DDC-ADM (Doc. 77); (b) *Stoneberger et al. v. BP Energy
Company, et al.*, Case No. 23-1195-DDC-ADM (Doc. 47); (c) *Rebein, et al. v. BP Canada Energy
Marketing Corp., et al.*, Case No. 23-1245-DDC-ADM (Doc. 55); (d) *Deutscher, et al. v. Tenaska
Marketing Ventures, et al.*, Case No. 23-1249-DDC-ADM (Doc. 1); and (e) *Rice, et al. v. Southwest
Energy, L.P., et al.*, Case No. 24-1005-DDC-ADM (Doc. 33).

[3]    The putative residential classes correspond with the case numbers in this fashion:  (a) the Kansas
Gas Service (KGS) residential class—member case 23-1192; (b) the Kansas Municipal Gas Agency
(KMGA) residential class—member case 23-1195; (c) the Black Hills residential class—member case 23-
1245; (d) the Midwest Energy residential class—member case 23-1249; and (e) the Atmos residential
class—member case 24-1005.

[4]    Here's a list of the defendants and the member case(s) in which they appear, as reflected on the
court's docket:  BP Energy Company (defendant in member cases 23-1192, 23-1195, and 23-1245);
Southwest Energy, LP (defendant in member cases 23-1192, 23-1245, 23-1249, and 24-1005); Macquarie
Energy, LLC (defendant in member cases 23-1192, 23-1195, 23-1245, 23-1249, and 24-1005); Rockpoint
Gas Storage, LLC (defendant in member case 23-1192); Tenaska Marketing Ventures (defendant in
member cases 23-1192, 23-1245, 23-1249, and 24-1005); CIMA Energy, Ltd. (defendant in member case
23-1195); Southwest Energy Corporation (defendant in member case 23-1195); BP Canada Energy

Defendants filed a Joint Motion to Dismiss (Doc. 3), in which all defendants joined. Some defendants also filed individual Motions to Dismiss (Doc. 5; Doc. 10; Doc. 11; Doc. 12; Doc. 16; Doc. 17; Doc. 20; Doc. 21). And one defendant filed a Supplemental Brief (Doc. 19) in lieu of an individual dismissal motion. Having reviewed the parties' papers, the court concludes it needn't reach the individual dismissal motions, however. The Joint Motion to Dismiss (Doc. 3) argues that the Natural Gas Act (NGA), 15 U.S.C. §§ 717–717z, preempts plaintiffs' claims here. The court agrees. So, the court dismisses all five Complaints under the doctrine of field preemption.

In summary fashion, the court concludes that plaintiffs' KCPA claims amount to regulation in the field of gas transportation and sales for resale that Congress intended the Federal Energy Regulatory Commission (FERC) to occupy. The court holds in view, of course, that "'the case for federal pre-emption becomes a less persuasive one'" under a cooperative regime. *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring) (quoting *N.Y. State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)). And the court acknowledges that the NGA instituted just such a regime, "where 'coordinate state and federal efforts exist within a complementary administrative framework.'" *Id.* (quoting *N.Y. State Dep't of Social Servs.*, 413 U.S. at 421). Nonetheless, plaintiffs' claims challenge sales prices in transactions between natural gas suppliers and distributors—wholesale sales over which FERC maintains exclusive jurisdiction. Plaintiffs assert that the pass-through effect of those wholesale prices on residential consumers permit their state law consumer protection claims

---

Marketing Corp (defendant in member case 23-1245); Mercuria Energy America, Inc. (defendant in member case 23-1245); NextEra Energy Marketing, LLC (defendant in member case 24-1005); Spotlight Energy, LLC (defendant in member cases 23-1245 and 24-1005); Williams Energy Resources, LLC (defendant in member case 24-1005); CIMA Energy, L.P. (defendant in member case 24-1005); Concord Energy, LLC (defendant in member cases 23-1245 and 24-1005); and ETC Marketing, Ltd. (defendant in member case 23-1192).

here.  While the analysis is hardly a simple one, plaintiffs' arguments don't persuade the court.

The pass-through effect on retail sales doesn't suffice to supersede Congressional delegation of

wholesale jurisdiction to FERC.  The court explains its ruling in more detail below.  But before it

can reach the heart of the matter, the court must address two preliminary matters.

*First*, this Order relies on some cases that implicate the Federal Power Act (FPA)—not

the NGA—and its jurisdictional spheres.  The court may so rely because the United States

Supreme Court has deemed provisions of the FPA and NGA "analogous" and "has routinely

relied on NGA cases in determining the scope of the FPA, and vice versa."  *Id.* at 164 n.10

(majority opinion).  *Second*, this Order relies on some cases that assess whether a state

*regulation* or *order*—not a state law *claim*—invades FERC jurisdictional territory.  Again, the

Supreme Court permits this approach.  The Court has recognized that "state regulation can

be . . . effectively exerted through an award of damages, and the obligation to pay compensation

can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

*Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quotation cleaned up).  In other

words, "damages claims can serve the same effect as regulations."  *Simmons v. Sabine Authority*

*River Auth. La.*, 732 F.3d 469, 477 (5th Cir. 2013).

With those preliminary precepts in mind, the court turns to the heart of the matter.  It

begins with the background facts.

## I.        Background

As explained above, this consolidated action includes five putative class action

Complaints.  Many—though not all—of the Complaints' allegations are identical.  The court first

recites the background facts common to all five Complaints.  In so doing, the court cites only to

the first-filed case (*Mehl, et al. v. BP Energy Co., et al.*, Case No. 23-1192), for sake of clarity

and efficiency.  To the extent the common background facts require citing a different Complaint,

the court provides those citations in footnotes.  After the common facts, the court then takes up the unique allegations of each Complaint individually, in the order plaintiffs filed them.

As it must, the court accepts the Complaints' facts as true, and views them in the light most favorable to plaintiffs—the party opposing the Motions to Dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining on a motion to dismiss that the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

The court begins its factual survey with a brief overview of supplier-distributor natural gas transactions.  Recall that all defendants are suppliers who sold natural gas to one or more of the five distributors (KGS, KMGA, Black Hills, Midwest Energy, and Atmos).  So, a working knowledge of supplier-distributor transactions proves helpful.

### *Supplier-Distributor Natural Gas Transactions*

Local distributors acquire gas from suppliers in three ways:  (1) baseload agreements; (2) callable agreements; and (3) spot purchases.  Case No. 23-1192, Doc. 77 at 5–6 (Am. Compl. ¶¶ 21–24).  Distributors then resell the gas in the retail market to businesses and residential customers, like plaintiffs here.  *Id.* at 5 (Am. Compl. ¶ 18).

*Baseload agreements* provide distributors with reserved baseload gas, negotiated in advance—often in the summer—by referencing historical natural-gas usage.  *Id.* at 6 (Am. Compl. ¶ 22).  Suppliers then deliver the baseload gas for use or storage when demand for natural gas is high.  *Id.*  Baseload agreements use prices tied to a "first of the month" (FOM) price survey, published by an independent price reporting agency—S&P Global's Platts.  *Id.* at 5, 6 (Am. Compl. ¶¶ 19, 22).  Platts collects data about natural gas trades and publishes both daily and monthly price indexes for various natural gas trading locations.  *Id.* at 5 (Am. Compl. ¶ 19).

*Callable agreements* allow distributors to call for additional natural gas if the seasonal use exceeds historical usage levels. *Id.* at 6 (Am. Compl. ¶ 23). Suppliers often charge distributors to reserve callable volumes because distributors, in the end, may not purchase the callable volumes during the season. *Id.* Suppliers set callable volume prices (before distributors call for that volume) at the daily trading price reflected in Platts Gas Daily, a trade publication of a daily price index. *Id.* Platts determines the daily index by calculating the average price of a day's voluntarily reported trades at a specific pipeline location. *Id.* at 5, 7 (Am. Compl. ¶¶ 20, 25).

Finally, distributors make *spot purchases* when they need a volume of natural gas that exceeds their baseload and callable volumes. *Id.* at 6 (Am. Compl. ¶ 24). Distributors contract for spot purchases of gas at or near the time of use. *Id.* Suppliers and distributors negotiate a spot price, usually at a premium above Platts Gas Daily price. *Id.*

### Winter Storm Uri and Natural Gas Prices

In February 2021, Winter Storm Uri caused temperatures in Kansas to deviate substantially from their historical averages. *Id.* at 13 (Am. Compl. ¶ 42); *see also id.* at 16 (Am. Compl. ¶ 51) (showing deviations as big as 42 degrees below historical average in Wichita, Kansas in mid-February 2021). As temperatures plummeted, the natural gas prices index experienced an inverse—and corresponding—ascent. *Id.* at 15 (Am. Compl. ¶ 45). Platts only could calculate daily index prices at any given location based on trades *voluntarily reported*— which apparently were meager.[5] *Id.* at 5, 18 (Am. Compl. ¶¶ 20, 57) (alleging daily spot price for February 17, 2021, at Southern Star location based on just two trades, representing just 0.5%

---

[5]    Plaintiffs' Response to defendants' Joint Motion to Dismiss contends that this meager reporting created "manufactured demand" such that "the charges that *every* defendant was demanding are the result of . . . a demand curve that numerous defendants spiked[.]" Case No. 24-1073, Doc. 56 at 34–35, 37 (emphasis in original).

of the total natural gas moving through the Southern Star pipeline).  As a result, prices spiked.  *Id.* at 22 (Am. Compl. ¶ 68) (noting spot price for natural gas at Southern Star location topped out at 20 times higher than its 15-year peak).

### *Force Majeure and Supply Cuts*

As the natural gas prices skyrocketed, plaintiffs allege that suppliers "throughout the industry" made force-majeure declarations in their existing baseload and callable agreements with distributors.  *Id.* at 19 (Am. Compl. ¶ 59).  These declarations allegedly allowed suppliers to resell gas designated for baseload or callable contracts at "exponentially higher spot price[s]."  *Id.*  Also, some suppliers simply refused to deliver previously contracted-for gas volumes—a supply cut that didn't depend on a force majeure declaration.  *Id.* at 20 (Am. Compl. ¶ 63).[6]

Plaintiffs contend the suppliers engaging in force majeure declarations and other supply cuts actually invoked price majeure—a colloquial industry term used when suppliers wiggle out of their lower-priced, baseload agreements to secure higher resale prices for the same natural gas on the spot market.  *Id.* at 20 (Am. Compl. ¶ 64); *id.* at 20 n.58.  Indeed, some of the Complaints assert that the "force-majeure declarations were false," *i.e.* unnecessary, as evidenced by the continuous supply of natural gas during the storm.[7]  Other Complaints compare defendants' substantial spot sales with their supply cuts and conclude that "[n]othing in the market . . . hampered [the supplier's] ability to make good on its . . . commitment[.]"[8]  That is,

---

[6]    *See also* Case No. 24-1005, Doc. 33 at 13 (Am. Compl. ¶ 57) ("For example, in testimony to the KCC [Kansas Corporation Commission], Symmetry catalogued unprecedented supplier cuts of Atmos's baseload gas, including the majority of Symmetry's baseload gas supply on certain days." (quotation cleaned up)).  In their Response to defendants' Joint Motion to Dismiss, plaintiffs shore up their supplier-cuts allegations listing specific suppliers and the dates on which those suppliers cut KGS's baseload supply.  Case No. 24-1073, Doc. 56 at 13.

[7]    Case No. 23-1249, Doc. 1 at 10 (Compl. ¶ 43); *see also* Case No. 23-1245, Doc. 55 at 13 (Am. Compl. ¶ 46) ("Many, if not all, of those force-majeure declarations and supply cuts were false.").

[8]    Case No. 23-1195, Doc. 47 at 16 (Am. Compl. ¶¶ 56–57).

the supply of gas throughout the storm "did not significantly change." *Id.* at 20 (Am. Compl. ¶ 65). Indeed, the Southern Star Pipeline never lost pressure, which indicates, plaintiffs allege, the constancy of the gas supply. *Id.* (Am. Compl. ¶ 64). So, plaintiffs conclude, Southern Star never "reach[ed] a point where it could not deliver the volume of natural gas that had been nominated by its customer-users or distributors." *Id.* (Am. Compl. ¶ 65). In short, supply issues didn't produce defendants' market behavior. Efforts to drive prices up did.

Nonetheless, distributors had no choice but to purchase gas at exorbitant spot prices, plaintiffs contend, because the Kansas Corporation Commission (KCC) all but required it. *Id.* at 23 (Am. Compl. ¶ 70). KCC had directed distributors in an Emergency Order "'to do all things possible and necessary to ensure natural gas . . . services continue'" during the storm. *Id.*[9]

### *Plaintiffs' Claims*

All five Complaints bring the same claims under the KCPA. They allege defendants engaged in unconscionable acts and practices by puppeteering excessively one-sided spot price transactions during Winter Storm Uri. *Id.* at 29 (Am. Compl. ¶¶ 105–107). And, they allege, defendants profiteered from the disaster within the meaning of the KCPA, increasing the prices they charged for natural gas and charging unjustifiably high prices, damaging plaintiffs. *Id.* at 30 (Am. Compl. ¶¶ 111–113).

Next, the court turns to facts alleged individually by the five Complaints. The court draws those facts from the Complaints, presenting them in the order of filing.

---

[9]     Quoting Emergency Order, *In the Matter of Record Natural Gas Prices and Potential System Reliability Issues from Unprecedented and Sustained Cold Weather*, Docket No. 21-GIMX-303-MIS, at 3 ¶ B (Kan. Corp. Comm'n, February 15, 2021).

### *The Individual Complaints*

The Complaints necessitate individual treatment when it comes to three categories of allegations:  the attributes of the distributor unique to each geographical region; the specific transactions between that distributor and particular defendants in February 2021; and the mechanism which that distributor used to pass on the February 2021 natural gas prices to its residential consumers.  The court recites each Complaint's specific allegations for all three categories.

### *KGS Residential Class Complaint*

KGS, a natural gas distributor, serves about 648,000 customers in 360 Kansas communities.  Case No. 23-1192, Doc. 77 at 7 (Am. Compl. ¶ 29).  In February 2021, KGS purchased gas from defendant suppliers BP Energy, Southwest Energy, Macquarie Energy, ETC Marketing, Tenaska Marketing Ventures, and Rockpoint Gas Storage.  *Id.* at 9–12 (Am. Compl. ¶¶ 34–39).  Those purchases involved baseload agreements (tied to the First of Month—FOM— price), callable agreements (tied to the FOM or Gas Daily price), and spot purchases tied to the Gas Daily price or a higher, negotiated price.  *Id.* at 8 (Am. Compl. ¶ 32).

In February 2022, KCC approved a settlement agreement with KGS that allows KGS to recover from its customers the extraordinary gas costs incurred during Winter Storm Uri.  *Id.* at 23 (Am. Compl. ¶ 73).  Of the costs incurred, KGS's residential class will pay about $259 million—by way of a fixed monthly securitization charge totaling around $5.64 per month—over the next 10 years.  *Id.* at 25 (Am. Compl. ¶¶ 77–78).

### *KMGA Residential Class Complaint*

KMGA is a non-profit, interlocal public agency who purchases, schedules, and manages natural gas supply for more than 30 cities in Kansas.  Case No. 23-1195, Doc. 47 at 7 (Am. Compl. ¶ 27).  In February 2021, KMGA purchased natural gas from BP Energy, Southwest

Energy, Macquarie Energy, and CIMA Energy. *Id.* at 7–10 (Am. Compl. ¶¶ 30–33). The transactions reflect purchases based on baseload agreements, callable agreements, and spot purchases. *Id.*; *see also, e.g.*, *id.* at 28–44 (KMGA-BP Energy base contract), 64–80 (KMGA-CIMA base contract), 81–83 (February 2021 spot sales statement).

KMGA allocated its costs for natural gas during Winter Storm Uri equally among its member cities. *Id.* at 19 (Am. Compl. ¶ 64). Many of the cities KMGA serves passed ordinances to defer or spread out these costs. *Id.* (Am. Compl. ¶ 65). Twenty six KGMA member cities also participated in the Kansas Legislature's City Utility Low-Interest Loan program, securing loans from the state treasurer to cover "extraordinary electric or natural gas costs incurred" during Winter Storm Uri. *Id.* at 17, 18 (Am. Compl. ¶¶ 60, 63).

### *Black Hills Residential Class Complaint*

Black Hills distributed natural gas to 102,803 residential customers in February 2021, whose total natural gas usage accounted for nearly 70% of Black Hills's total natural gas sales. Case No. 23-1245, Doc. 55 at 7 (Am. Compl. ¶ 28). During Winter Storm Uri, Black Hills purchased gas from defendants BP Canada Energy Marketing, BP Energy, Macquarie Energy, Tenaska Marketing Ventures, Southwest Energy, and Mercuria Energy America. *Id.* at 17 (Am. Compl. ¶¶ 54–60). In contrast to some other Complaints in this consolidated action, the Amended Complaint for the Black Hills residential class doesn't break out Black Hills's gas purchases by type of agreement. *See id.* Instead, it calculates aggregate dollar amounts for natural gas sales between given defendants and Black Hills during the Winter Storm Uri period. *Id.*

On January 27, 2022, KCC approved a settlement with Black Hills. *Id.* at 18 (Am. Compl. ¶¶ 63–64). It allows Black Hills to recover from its customers about $87.9 million during the five-year period between February 2022 to January 2027. *Id.* This recovery requires

a monthly surcharge on Black Hill's residential customer's gas bills, anticipated to run about $11.47 per month. *Id.* (Am. Compl. ¶ 65).

### Midwest Energy Residential Class Complaint

Midwest Energy, Inc. is an electric and natural gas cooperative serving about 93,000 customers across 40 counties in central and western Kansas. Case No. 23-1249, Doc. 1 at 6 (Compl. ¶ 24). This Complaint alleges neither the type of transaction nor the total sales between Midwest Energy and the named defendants. *See generally id.*

In May 2021, Midwest Energy approved a natural-gas recovery plan to cover about $9.7 million in excess natural gas charges during February 2021. *Id.* at 12 (Compl. ¶ 48). It estimated that, on average, residential customers would pay an extra $8.27 per month. *Id.* In June 2023, Midwest Energy announced it had completed its payoff of $9.68 million in Winter Storm Uri natural gas charges. *Id.* (Compl. ¶ 49).

### Atmos Residential Class Complaint

Atmos Energy Corporation markets itself as the country's largest natural gas-only distributor, delivering natural gas to more than 3 million customers across eight states. Case No. 24-1005, Doc. 33 at 7 (Am. Compl. ¶ 30). Its customer base in Kansas, as reported in September 2021, totaled around 125,000 residential customers. *Id.* (Am. Compl. ¶ 31). In contrast to other distributors in this consolidated action, Atmos relies primarily on an asset manager—Symmetry—to acquire its natural gas and meet its supply and scheduling needs. *Id.* at 7–8 (Am. Compl. ¶¶ 32–33). During Winter Storm Uri, Symmetry engaged in spot purchases of natural gas from Southwest Energy, NextEra Energy Marketing, Macquarie Energy, Spotlight Energy, Williams Energy, CIMA Energy, and Tenaska. *Id.* at 18, 19–21 (Am. Compl. ¶¶ 74, 78, 80–84). Atmos also entered standard supply agreements. *Id.* at 7 (Am. Compl. ¶ 32). In February 2021,

12

Atmos directly purchased natural gas from Southwest Energy, primarily in the spot market, to the tune of some $5.6 million.  *Id.* at 14 (Am. Compl. ¶ 61).

On March 24, 2022, KCC approved a settlement agreement with Atmos.  *Id.* at 16 (Am. Compl. ¶ 68).  The agreement allows Atmos to securitize and recover about $102.5 million in extraordinary costs from its customers due to Winter Storm Uri natural gas purchases.  *Id.* Starting in July 2023, Atmos included a fixed charge of $6.49 on residential customers' monthly bills.  *Id.* at 17 (Am. Compl. ¶ 71).

The common and individual allegations in these five Complaints recommend that the court take up one final preliminary matter before reaching defendants' Joint Motion to Dismiss (Doc. 3):  jurisdiction under the NGA.  A brief primer on the jurisdictional division Congress has established in the natural gas markets lays the last groundwork necessary to resolve these motions.

## II.        Exclusive FERC Jurisdiction and the NGA

Even before Congress explicitly delineated jurisdiction in the natural gas markets, some distinct jurisdictional spheres already had emerged.  *See N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 90 (1963) ("[I]t was settled even before the passage of the Natural Gas Act, that direct regulation of the prices of wholesales of natural gas in interstate commerce is beyond the constitutional power of the States—whether or not framed to achieve ends . . . ordinarily within the ambit of state power.").  Then, with the NGA, Congress explicitly outlined those distinct spheres, conferring "upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300– 01 (1988).  "The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas or for state regulations which would indirectly achieve the same result."  *N. Nat. Gas*, 372 U.S. at 91 (internal citation omitted).

In the NGA, Congress declared that *federal* regulation of "matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce" is necessary as "in the public interest."  15 U.S.C. § 717(a).  And Congress conferred that regulatory authority on FERC, including the authority to review wholesale natural gas rates.  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 378 (2015) ("The [NGA], in § 5(a), gives rate-setting authority to the Federal Energy Regulatory Commission[.]").  FERC's authority extends to three areas:  "(1) the 'transportation of natural gas in interstate commerce,' (2) the 'sale in interstate commerce of natural gas for resale,' and (3) 'natural-gas companies engaged in such transportation or sale.'" *Panhandle E. Pipeline Co. v. State of Okla. ex rel. Comm'rs of Land Off.*, 83 F.3d 1219, 1225 (10th Cir. 1996) (quoting *Cascade Nat. Gas Corp. v. FERC*, 955 F.2d 1412, 1416 (10th Cir. 1992)).  FERC thus maintains exclusive jurisdiction over "any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of [FERC.]"  15 U.S.C. § 717d(a). In short form, wholesale natural gas rates are FERC territory.

Equally important to the court's work here, FERC also maintains exclusive jurisdiction over "any rule, regulation, practice, or contract affecting such rate, charge, or classification[.]" *Id.*; *see also Schneidewind*, 485 U.S. at 304 (1988) (identifying FERC's ability to examine and change rules and regulations as an exercise of FERC's authority).  That is, FERC—and no other entity—has authority to determine whether any wholesale natural gas rate *or practice* "is unjust, unreasonable, unduly discriminatory, or preferential[.]"  15 U.S.C. § 717d(a).  And when FERC deems a rate or practice unacceptable, FERC "shall determine the just and reasonable rate, . . . practice, or contract to be thereafter observed and in force, and shall fix the same by

order[.]" *Id.* In a nutshell, when there's a problem with natural gas wholesale sales, FERC must deal with it.

The states also have a role to play. "The [NGA] leaves regulation of *other* portions of the industry—such as production, local distribution facilities, and direct sales—to the States." *Oneok*, 575 U.S. at 379 (emphasis added). "States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain. . . . But States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates[.]" *Hughes*, 578 U.S. at 164. That is, "[n]ot the federal but the state regulation must be subordinated, when Congress has so plainly occupied the regulatory field." *N. Nat. Gas*, 372 U.S. at 93. In short, regulating wholesale sales of natural gas is FERC's realm—and FERC's realm alone. *See id.*

With this jurisdictional divide in mind, the court takes up defendants' Joint Motion to Dismiss (Doc. 3), below. Its analysis begins with the well-known standard for dismissal under Rule 12(b)(6) and ordinary preemption as an affirmative defense.

## III.        Motion to Dismiss Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' the complaint fails to state a claim." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

An affirmative defense—if properly established—can provide grounds for granting a motion to dismiss. *See Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965); *Jiying Wei v. Univ. of Wyo. Coll. of Health Sch. Pharmacy*, 759 F. App'x 735, 739–40 (10th Cir. 2019) (explaining it's appropriate to resolve affirmative defense on a 12(b)(6) motion to dismiss). But the court may dismiss a complaint because of an affirmative defense "only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

"Ordinary preemption may be invoked in both state and federal court as an affirmative defense to the allegations in a plaintiff's complaint. Such a defense asserts that the state claims have been substantively displaced by federal law." *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203 n.4 (10th Cir. 2012) (quotation cleaned up). "If the complaint establishes the applicability of a federal preemption defense, it can properly be the

subject of a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss." *Simmons*, 732 F.3d at 473 (citations omitted).

## IV.        Ordinary Preemption

"The preemption doctrine is rooted in the Supremacy Clause, which provides that the 'Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Panhandle E. Pipeline Co.*, 83 F.3d at 1225 (alterations in original) (quoting U.S. Const. Art. VI, cl. 2). Ordinary preemption—as opposed to complete preemption—manifests in three forms: express preemption, field preemption, and conflict preemption. *Devon Energy Prod.*, 693 F.3d at 1203 n.4.

"Express preemption arises from explicit preemption language in the statute. Implied preemption includes field preemption or conflict preemption. Field preemption occurs when Congress 'take[s] unto itself all regulatory authority' by legislating in a 'field which the States have traditionally occupied.'" *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011) (brackets in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), *aff'd*, 569 U.S. 614 (2013). In other words, field preemption arises "where Congress leaves 'no room' for state regulation in an entire area[.]" *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1092 (10th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). Conflict preemption, for its part, "occurs 'where Congress has not completely displaced state regulation in a specific area' and where 'state law is nullified to the extent that it actually conflicts with federal law.'" *Tarrant Reg'l Water Dist.*, 656 F.3d at 1241 (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

Defendants here assert both field preemption and conflict preemption as affirmative defenses. Because the court decides to dismiss with prejudice on field preemption grounds, it

needn't reach the conflict preemption question.  So, the court focuses its analysis on field

preemption under the NGA.  An overview of field preemption follows.  Then, the court explains

field preemption in the specific context of the Natural Gas Act.

## V.        Field Preemption

"Determining whether Congress has exercised its power under this clause to preempt

state law requires an examination of congressional intent."  *Panhandle E. Pipeline Co.*, 83 F.3d

at 1225 (citing *Nw. Cent. Pipeline v. Kan. Corp. Comm'n*, 489 U.S. 493, 509 (1989)).  That is,

"'the purpose of Congress is the ultimate touchstone in every pre-emption case.'"  *Hughes*, 578

U.S. at 163 (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)).  "A state law is

preempted where 'Congress has legislated comprehensively to occupy an entire field of

regulation, leaving no room for the States to supplement federal law[.]'"  *Id.* (quoting *Nw. Cent.*

*Pipeline*, 489 U.S. at 509).  Field preemption surfaces where "Congress has forbidden the State

to take action in the *field* that the federal statute preempts."  *Oneok*, 575 U.S. at 377 (emphasis in

original).  The "mere fact of intrusion" into that field "offends the Supremacy Clause."  *PPL*

*EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014).  Congress's intent to preempt a

field "can be inferred from a framework of regulation 'so pervasive . . . that Congress left no

room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the

federal system will be assumed to preclude enforcement of state laws on the same subject.'"

*Arizona*, 567 U.S. at 399 (ellipses in original) (quoting *Rice*, 331 U.S. at 230).

### A.        Field Preemption and the Natural Gas Act

The Supreme Court has held that Congress, in passing the NGA, "'occupied the field of

matters relating to wholesale sales and transportation of natural gas in interstate commerce.'"

*Oneok*, 575 U.S. at 376 (quoting *Schneidewind*, 485 U.S. at 305); *see also Panhandle E. Pipeline*

*Co.*, 83 F.3d at 1226 ("In enacting the NGA, Congress enacted a comprehensive scheme of

federal regulation of all wholesales of natural gas in interstate commerce." (quotation cleaned up)).  Indeed, Congress enacted the NGA on the heels of multiple Supreme Court cases holding that "the Commerce Clause *forbids* the States to regulate . . . the interstate shipment and sale of gas to local distributors for resale." *Oneok*, 575 U.S. at 378 (emphasis added) (citing *Public Util. Comm'n v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927)); *see also Panhandle E. Pipeline Co.*, 83 F.3d at 1225 ("The NGA was enacted in 1938, after a series of Commerce Clause cases striking down state laws left the states powerless to regulate interstate transportation and wholesales of natural gas." (quotation cleaned up)).  Congress enacted the NGA to "fill this void" in state authority.  *Panhandle E. Pipeline Co.*, 83 F.3d at 1225.  Given this long-standing division between federal and state power, "the proper test for purposes of pre-emption in the natural gas context is whether the challenged measures are 'aimed directly at interstate purchasers and wholesales for resale' or not."  *Oneok*, 575 U.S. at 386 (quoting *N. Nat. Gas*, 372 U.S. at 94).

Putting it another way, field preemption turns in this consolidated action on whether plaintiffs' KCPA claims "regulate[] *within* this exclusively federal domain."  *Schneidewind*, 485 U.S. at 305 (emphasis in original).  The question seems straightforward enough.  Were the sales at issue here on the federal or state side of the jurisdictional divide?  But the Supreme Court itself has acknowledged that this "aimed directly at" question isn't one answered easily.

The Supreme Court has recognized the interconnectedness of wholesale and retail rates and practices—and the plethora of jurisdictional disputes that result.  *Nw. Central Pipeline*, 489 U.S. at 515 ("It is inevitable that jurisdictional tensions will arise as a result of the fact that state and federally regulated elements coexist within a single integrated system—particularly since gas is often produced under contracts[.]" (quotation cleaned up)); *see also FERC v. Electric*

*Power Supply Ass'n (EPSA)*, 577 U.S. 260, 265 (2016) ("Th[e] statutory division generates a steady flow of jurisdictional disputes because—in point of fact if not of law—the wholesale and retail markets in electricity are inextricably linked."). Disentangling these linked markets to determine a regulation or state law claim's *target* is the crux of a preemption analysis. *Oneok*, 575 U.S. at 385 (explaining that Supreme Court precedents "emphasize the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted" (emphasis in original)).

So, how does the court decide whether plaintiffs' KCPA claims here are "*aimed directly at* interstate purchasers and wholesales for resale" or, instead, are "aimed at subjects left to the States to regulate"? *Id.* (emphasis in original). The Supreme Court's holding in *EPSA* proves instructive. It clarifies that ripple effects in the retail market don't permit a state to regulate the wholesale market, as the court explains below.

But first, the court clarifies the organizational structure of its analysis, going forward. The court aims to situate plaintiffs' claims in the proper jurisdictional sphere by reviewing several Supreme Court cases addressing the Federal Power Act and Natural Gas Act jurisdictional division. The court begins with the question of ripple effects in part B, followed by the related question of pass-through effects in part C. In essence, these two sections acknowledge how the wholesale and retail markets intertwine with one another, and reviews how the Supreme Court has parsed jurisdiction when the effects of one market traverse the jurisdictional divide. Then, the court highlights the history of FERC enforcement actions in part D, demonstrating that FERC acts upon the unconscionable price and market manipulation concerns raised by plaintiffs' Complaints here. Finally, in part E, the court reaches the case plaintiffs bet all their chips on—*Oneok*. In *Oneok*, the Supreme Court permitted state antitrust

claims against natural gas companies to survive the preemption analysis. And plaintiffs argue their claims fall in the same bucket as the *Oneok* claims. The court engages plaintiffs' argument against the backdrop of the previously surveyed case law.

Plaintiffs' Complaints rest largely on the notion that the *effects* on retail consumers resulting from the supplier-distributor transactions at issue here open the way for their state law consumer protection claims. So, the court begins its review of jurisdictional precedent with effects, looking at how to parse jurisdiction when behaviors in one market spill over into another.

### B.    *EPSA* and the "aimed directly at" Analysis

In *EPSA*, the Supreme Court addressed market operators' payments for demand response commitments. 577 U.S. 260. Demand response "pays *consumers* for commitments to curtail their use of power . . . to curb wholesale rates and prevent grid breakdowns" at times of particularly high demand. *Id.* at 270 (emphasis added). In earlier *EPSA* proceedings, the D.C. Circuit had vacated a FERC rule regulating the compensation operators pay for demand response bids. *Id.* at 275. The D.C. Circuit had concluded that FERC's rule exceeded the limits of its jurisdiction because in "luring retail customers into the wholesale market, and causing them to decrease levels of retail electricity consumption, the Rule engages in direct regulation of the retail market." *Id.* (quotation cleaned up). One can see how the Circuit reached that conclusion: the involvement of *consumers* and the effect on *retail* rates prompted the Circuit to conclude that FERC's rule implicated the *state*'s jurisdictional territory, not FERC's. *See id.*

The Supreme Court reversed. It did so acknowledging, *first*, that Congress had delegated to FERC responsibility "to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them." *Id.* at 277. *Second*, the Court emphasized that the Federal Power Act limits FERC's jurisdiction "to rules or practices that *directly* affect the wholesale rate." *Id.* at 278 (emphasis in original) (quotation cleaned up).

21

*Finally*, the Court concluded that payment for demand response bids directly affected *wholesale* rates. To illustrate this direct effect, the Court contrasted the regulation at issue with a hypothetical regulation that "specifie[d] terms of sale at retail—which is a job for the States alone." *Id.* at 280. The Court explained that even if the latter terms-of-sale-at-retail regulation would have a "direct, or dramatic, . . . impact on wholesale rates" which would "alter wholesale prices," FERC's jurisdiction wouldn't extend to encompass it. *Id.* That's so because the terms-of-sale-at-retail regulation would affect wholesale rates—not directly—but through an "ineluctable consequence." *Id.*

So, the Supreme Court didn't draw the jurisdictional boundary based on whether the regulation involved or affected consumers and retail rates. Instead, the Court distinguished between jurisdictional spheres based on whether the regulation aimed at the wholesale market or the retail market, *regardless of the ripple effect it might have in the other market*. And, in *EPSA*, the regulation targeted the wholesale market, even though the demand response payment went to consumers. The attendant effects on retail rates—"in either the short or the long term"—were "of no legal consequence." *Id.* at 281. In other words, FERC's action affected consumer wallets, but nonetheless *targeted* wholesale markets. And so, the Court held, it fell squarely in FERC's jurisdictional territory.

Here, plaintiffs never dispute that the transactions at issue were wholesale transactions in interstate gas, regulated under the Natural Gas Act.[10] *See generally* Doc. 56. Instead, plaintiffs

---

[10]    The parties' papers assume that the transactions at issue here were interstate gas transactions governed by the NGA. According to FERC's long-held position, gas once sold or transported in a transaction subject to NGA regulations remains subject to the NGA in subsequent transactions, whether interstate or intrastate. *BP Am., Inc. v. FERC*, 52 F.4th 204, 217 (5th Cir. 2022). FERC explained it like this: "Gas in interstate commerce is considered to remain in interstate commerce all the way to the burner tip. Thus, even though the downstream trans actions occur entirely within Texas, the state in which the gas is consumed, the gas is nevertheless considered in interstate commerce[.]" *Westar Transmission Co.*, 43 FERC 61,050, 61,141 n.12 (1988). Given this broad understanding of interstate gas, the court

argue, defendants' unconscionably high rates—aggravated by their alleged force majeure declarations and supplier cuts—"passed through" to plaintiffs' retail rates. *Id.* at 14 ("Collectively, the defendants' sales imposed . . . extraordinary or excess costs on the plaintiffs' distributors, that the plaintiffs' distributors inevitably passed through to the plaintiffs and other customers[.]"). This pass-through mechanism, plaintiffs contend, allows state law claims premised on retail rates to move forward apart from any preemption concerns. That's because those state law claims purportedly are "'directed at practices affecting retail rates," placing them "'firmly on the States' side of [the] dividing line.'" *Id.* at 36 (quoting *Oneok*, 575 U.S. at 386). Plaintiffs contend that "the plaintiffs' claims [here] are leveled at practices that caused hundreds of millions in *retail* rates that the plaintiffs are saddled with from background market conditions, including a declared disaster, manufactured demand, and oppressive sales that the plaintiffs had no choice but to accept." *Id.* at 36–37 (emphasis in original). In brief, plaintiffs assert that the effect of these transactions in the retail market is so extensive that jurisdiction here over those effects falls to the states.

To be sure, what happens at the wholesale level affects consumers' retail rates. The two are necessarily interconnected. And so, the practices and rates surrounding Winter Storm Uri's wholesale natural gas transactions affected residential consumers' wallets—and in a way residential consumers couldn't control. But plaintiffs' claims challenge rates and practices that occurred in the natural gas *wholesale* market—between defendants and distributors they sold to—and not in the *retail* market. Yes, ripple effects of those wholesale transactions "passed through" to residential consumers, raising some retail bills for years to come. Plaintiffs' claims rest on those pass-through effects. But those effects are simply "an inevitable consequence of a

---

concludes—particularly in the absence of any argument to the contrary—that the transactions at issue here were interstate gas transactions governed by the NGA.

system in which power is shared between state and national governments." *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 524 (7th Cir. 2018) (holding the necessarily opposite corollary: when states exercise their reserved powers under the Federal Power Act the *effects* on interstate sales do not lead to preemption); *accord Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 54 (2d Cir. 2018) (concluding that when a state program has the *incidental* effect of "exert[ing] downward pressure on wholesale electricity rates" that "incidental effect is insufficient to state a claim for field preemption under the FPA"). Thus, the pass-through effects on the retail market don't open a path for state law claims to challenge rates and practices that rest squarely within FERC jurisdiction.

Indeed, in *Nantahala Power & Light Co. v. Thornburg* the Supreme Court explicitly rejected plaintiffs' pass-through logic as a basis to overcome FERC jurisdiction. 476 U.S. 953 (1986).

### C.    *Nantahala* and Pass-Through Effects

In *Nantahala*, the North Carolina Utilities Commission (NCUC) sought to mitigate prices for retail electric customers by issuing an order altering the allocation of entitlement power between two power companies. 476 U.S. at 955. The NCUC, in essence, endeavored to stop a utility from passing FERC-mandated wholesale rates through to consumers. *Id.* Consequently, the utility couldn't recover their "full costs of acquiring power under the FERC-approved scheme[.]" *Id.* at 971. The Supreme Court concluded that "[s]uch a 'trapping' of costs [was] prohibited." *Id.* at 970. It conceded that "FERC-approved wholesale rates *need not* lead to an increase in retail rates." *Id.* at 967 (emphasis added). But the Court clarified "that such a divergence between wholesale and retail rates would occur only if costs *other than* those resulting from the purchases of FERC-regulated power or gas were to decrease." *Id.* (emphasis in original). In other words, the NCUC couldn't mitigate the wholesale rate's pass-through

effect on retail consumers.  It only could alter retail rates by looking to other cost-saving measures.  NCUC's attempt to mitigate pass-through costs was tantamount to "impermissible interference . . . with the scheme of federal regulation."  *Id.* at 970.  And so, it couldn't "withstand the pre-emptive force of FERC's decision."  *Id.* at 968.

Plaintiffs' claims present a similarly impermissible interference here.  Plaintiffs endeavor to employ state consumer protection law to mitigate the wholesale rate's pass-through effect on retail gas consumers.  And while FERC hasn't approved specifically the spot prices and practices at issue in these Winter Storm Uri sales, FERC has adopted a free market approach to regulating its jurisdictional sphere of the natural gas market.  *Oneok*, 575 U.S. at 380 ("FERC adopted an approach that relied on the competitive marketplace, rather than classical regulatory rate-setting, as the main mechanism for keeping wholesale natural-gas rates at a reasonable level." (emphasis omitted)).  Plaintiffs' claims allege the wholesale natural gas rates stemming from FERC's competitive marketplace approach during Winter Storm Uri were unreasonable, unconscionable, and excessively one-sided.  And they contend that the effect of those wholesale rates on retail consumers' gas bills justifies their lawsuit.  So, just as in *Nantahala*, plaintiffs' claims try to mitigate the wholesale rate's pass-through effect on retail consumers.

In sum, plaintiffs' damages claims here exert the same regulatory effect on wholesale prices that *Nantahala* found impermissible.[11]  Bolstering this impermissibility conclusion is

---

[11]    The court acknowledges that the regulatory effect in *Nantahala* came through a state *order* while this case involves state law *claims*.  But the court already addressed the applicability of case law directed at orders or regulations to state law claims.  To reiterate, the Supreme Court has concluded that state regulation can manifest through state law claims and damages awards:  "[S]tate regulation can be . . . effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."  *Kurns*, 565 U.S. at 637.  As the Fifth Circuit succinctly summed up, "damages claims can serve the same effect as regulations."  *Simmons*, 732 F.3d at 477.

FERC's explicit enforcement authority over market manipulation and reasonable wholesale pricing, which the court outlines in the following section.

### D.    FERC's Enforcement Authority over Market Manipulation

Congress explicitly conferred authority on FERC to address the precise concerns raised by plaintiffs' claims. Plaintiffs' claims target the price indices' fairness and natural gas companies' practices (like force majeure declarations and supply cuts) allegedly manipulating that price index, resulting in spiked spot prices. These concerns are precisely the type of issues FERC has addressed in the past.

### 1.    Overview of FERC Enforcement Authority

*Oneok* chronicles FERC's oversight efforts after deregulation in the late 1980s and early 1990s. At that time, "FERC adopted an approach that relied on the competitive marketplace, rather than classical regulatory rate-setting, as the main mechanism for keeping *wholesale* natural-gas rates at a reasonable level." *Oneok*, 575 U.S. at 380. But relying on the free-market system for setting interstate pipeline rates brought its own problems. *Id.* at 381. Distributors and other direct-sales customers had to rely on privately published price indices, which FERC itself determined to be inaccurate. *Id.* The indices relied on voluntary reporting of natural gas trades, which allowed natural gas companies to manipulate the price indices by false reporting or wash trades. *Id.* In response, FERC developed a Code of Conduct setting standards for price index calculations. *Id.* at 382. This Code allowed FERC to revoke blanket marketing certificates for those jurisdictional sellers engaged in market manipulation. *Id.* Congress also granted FERC authority in the Energy Policy Act of 2005 to address such market manipulation strategies. *Id.* FERC has "the authority to issue rules and regulations to prevent 'any manipulative or deceptive device or contrivance' by 'any entity . . . in connection with the purchase or sale of natural gas or

the purchase or sale of transportation services subject to the jurisdiction of" FERC." *Id.* (ellipses in original) (quoting 15 U.S.C. § 717c-1).

*Oneok*'s chronology of FERC actions suggests plaintiffs' concerns about price indexes and market manipulation are prototypal FERC territory.  To be sure, the challenged rates and practices affect retail rates.  But the challenged rates and practices occurred during wholesale transactions.  And so, any reconsideration or correction or punishment of those rates and practices falls to FERC, not to plaintiffs asserting state law claims.  *See* 15 U.S.C. § 717d(a) ("Whenever the Commission . . . shall find that any rate, . . . or that any rule, regulation, practice, or contract affecting such rate . . . is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, . . . practice, or contract to be thereafter observed and in force, and shall fix the same by order[.]"); *see also Schneidewind*, 485 U.S. at 301–04 (explaining various tools FERC possesses to exercise its comprehensive authority over natural gas companies, including the ability to examine and change, among other things, practices and contracts as permitted by § 717d(a)); *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852 (9th Cir. 2004) (affirming preemption-based dismissal of state law unfair competition claims premised on fraudulent energy sales in the spot market because those claims "encroach[ed] upon . . . an area reserved exclusively to FERC, both to enforce and to seek remedy" (emphasis added)), *opinion amended on denial of reh'g*, 387 F.3d 966 (9th Cir. 2004). All of that to say, FERC has jurisdiction to correct or reconsider natural gas wholesale market rates and manipulation concerns.  And FERC exercises it regularly.

### 2.    FERC Enforcement Actions

FERC has exercised its authority over market manipulation concerns in circumstances similar to those presented here.  For example, FERC brought an enforcement action against BP America, Incorporated for its alleged market manipulations following Hurricane Ike's September

2008 devastation in southeastern Texas. *BP Am.*, 52 F.4th at 210. FERC alleged that BP had "capitalized on the hurricane-induced chaos in commodities markets by devising a scheme to manipulate the market for natural gas" and it imposed a $20 million civil penalty on BP. *Id.* The Fifth Circuit affirmed FERC's jurisdiction to impose such reprimands "over transactions in interstate natural gas directly regulated by the Natural Gas Act (NGA)" and upheld FERC's order to the extent the market manipulation directly implicated such interstate sales. *Id.* The alleged market manipulations at issue here are likewise subject to FERC enforcement actions.

Indeed, FERC announced its intent to review natural gas transactions during Winter Storm Uri on February 22, 2021. *FERC to Examine Potential Wrongdoing in Recent Cold Snap*, FERC, https://www.ferc.gov/news-events/news/ferc-examine-potential-wrongdoing-markets-during-recent-cold-snap (last visited Jan. 28, 2025). FERC indicated it would assess whether companies had manipulated the market:

> The Federal Energy Regulatory Commission (FERC) announced today that its Office of Enforcement is examining wholesale natural gas and electricity market activity during last week's extreme cold weather to determine if any market participants engaged in market manipulation or other violations. If the Office of Enforcement finds any potential wrongdoing that can be addressed under FERC's statutory authority, it will pursue those matters as non-public investigations. FERC explained that this examination will take place as part of the Division of Analytics and Surveillance's (DAS) ongoing surveillance of market participant behavior in the wholesale natural gas and electricity markets.

*Id.* FERC thus has asserted it possesses authority to address any market manipulation during Winter Storm Uri. This announcement, standing alone, suggests that plaintiffs' KCPA claims—premised on similar allegations of market manipulation—trespass into FERC territory. And courts addressing similar circumstances have reached the same result—even when retail customers had experienced unremedied damages.

### 3. *Woolsey* and Unremedied Retail Consumer Damages

In *Woolsey v. J.P Morgan Ventures Energy Corp.*, for example, plaintiffs alleged that defendants had "manipulated the price of electricity in the California electricity market, to the detriment of California retail consumers." No. 15-cv-530-WQH-BGS, 2015 WL 6455571, at *1 (S.D. Cal. Oct. 26, 2015), *aff'd*, 691 F. App'x 308 (9th Cir. 2017). FERC investigated and determined, among other things, that defendants had manipulated the market and "employed fraudulent schemes" that "would operate as a fraud on participants in the California wholesale electricity market[.]" *Id.* As a result, FERC and defendants settled the investigation and FERC recovered from defendants around $124 million in unjust profits. *Id.* at *2. But plaintiffs—California individual retail electricity consumers (and those similarly situated)—weren't satisfied. They argued that the "actual damages to California electrical ratepayers from the cost of paying for defendants' illegal market manipulation was substantially in excess of the unjust profits FERC recouped on behalf of California electrical consumers." *Id.* And so, plaintiffs sued, alleging that defendants had violated the Racketeer Influenced and Corrupt Organization Act (RICO) and sought compensatory and treble damages, along with other costs and fees. *Id.*

Defendants responded that plaintiffs' RICO claim warranted dismissal as "an impermissible attempt to circumvent FERC's exclusive authority to enforce the Federal Power Act" and noted that the FPA's statutory scheme doesn't "establish a private cause of action for aggrieved parties." *Id.* at *8. The court agreed. It explained that because "FERC has exclusive authority to remedy violations of the FPA and the FPA does not confer a private right of action, Defendants alleged violations of the FPA cannot form the basis of a RICO claim." *Id.* at *9.

Here, plaintiffs similarly suggest Kansas natural gas retail consumers experienced actual damages from defendants' alleged market manipulation. Plaintiffs allege that "when [d]efendants entered spot-price transactions during Winter Storm Uri, they charged a price that

29

grossly exceeded the price at which similar natural gas was readily obtainable in similar transactions by similar consumers." Case No. 23-1192, Doc. 77 at 29 (Am. Compl. ¶ 105). And plaintiffs contend this price manipulation was an unconscionable act or practice from which plaintiffs have sustained damages. *See, e.g.*, Case No. 24-1005, Doc. 33 at 24 (Am. Compl. ¶ 109) ("[T]he damages claimed are those amounts the Court determines to be unconscionable . . . with specific amounts to be assessed . . based on charges made by each Defendant . . . passed through to its residential consumers."); Case No. 23-1245, Doc. 55 at 22 (Am. Compl. ¶ 93) (same); Case No. 23-1192, Doc. 77 at 29 (Am. Compl. ¶ 107) (same). But, as in *Woolsey*, even if plaintiffs have sustained damages that FERC may or may not recoup fully by investigation and enforcement, plaintiffs can't invade FERC territory to recover those damages. Nor does the Natural Gas Act confer a private right of action. 15 U.S.C. § 717c-1 (specifying provision doesn't "create a private right of action"); *see also Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, No. 15-CV-1576-AJB-RBB, 2016 WL 4087302, at *4 (S.D. Cal. Aug. 1, 2016) (dismissing breach of tariff claim with prejudice because Federal Power Act doesn't provide private right of action for energy market manipulation). So, just as the court in *Woolsey* concluded, the court concludes that FERC has exclusive authority to remedy market manipulations or price spikes in wholesale natural gas transactions. Plaintiffs here have no such right.

To counteract this result, plaintiffs lean heavily into the Supreme Court's holding in *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373. The court discusses it in detail, below.

### E.   *Oneok*

*Oneok* held that plaintiffs' state-law antitrust claims survived NGA field preemption. 575 U.S. at 376. Plaintiffs argue that their claims fall in the same category as the *Oneok* claims and so, they too survive preemption. Doc. 56 at 36–37. Plaintiffs also contend the KCPA, like

the state antitrust laws at issue in *Oneok*, broadly applies and so isn't preempted. *Id.* at 37. Plaintiffs' reliance on *Oneok* is misplaced.

The reasons for this conclusion begin with a brief overview of *Oneok*.

### 1.    *Oneok* Overview

In *Oneok*, a group of manufacturers, hospitals, and other institutions who purchased natural gas directly from interstate pipelines (*i.e.*, direct-sales customers) sued those pipelines. 575 U.S. at 376. The *Oneok* plaintiffs claimed that the pipeline owners had engaged in behavior violating state antitrust laws. *Id.* Their suits all ended up in federal court. The Supreme Court set out to resolve "whether the Natural Gas Act pre-empts retail customers' state antitrust law challenges to practices *that also affect* wholesale rates." *Id.* at 384 (emphasis added). The dispositive question in *Oneok* went something like this: do the "state antitrust claims advanced by . . . direct-sales customers . . . fall within" the "field of matters relating to wholesale sales and transportation of natural gas in interstate commerce[?]" 575 U.S. at 377 (quotation cleaned up). The Supreme Court answered no—the NGA didn't preempt the state law claims. The Court grounded its holding in the same "aimed directly at" analysis already discussed. *Id.* at 385–86; *see* § V.B.

The Court explicitly invoked its precedents to reiterate "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Oneok*, 575 U.S. at 385 (emphasis in original). And it reviewed in detail how those precedents had sorted state actions into one or the other of these jurisdictional spheres. For example, the NGA didn't preempt a state's regulation of gas production that "might have *affected* the costs of the prices of interstate wholesale sales" because "the state regulation *aimed primarily at* protecting producers' rights—a matter firmly on the States' side of that dividing line." *Id.* (emphasis added) (quotation cleaned up). In contrast, the NGA preempted state orders which "were unmistakably and

unambiguously *directed at purchasers*." *Id.* at 385–86 (emphasis in original) (quotation cleaned up). After reviewing these precedents, the Court reached its conclusion: "Here . . . the lawsuits are directed at practices affecting retail rates—which are 'firmly on the States' side of that dividing line.'" *Oneok*, 575 U.S. at 386 (quoting *Nw. Centra Pipeline*, 489 U.S. at 514). As a result, the Natural Gas Act didn't preempt the state law antitrust claims because the "challenged measures" were not "aimed directly at interstate purchasers and wholesales for resale." *Id.* (internal quotation marks and citation omitted).

## 2.    Plaintiffs' claims vis-à-vis the *Oneok* claims

Plaintiffs work hard to place their claims in the same basket as the *Oneok* claims. *First*, plaintiffs argue that the practices at issue in *Oneok* affected both federally regulated wholesale natural gas prices and federally unregulated retail natural gas prices. Doc. 56 at 36. *Second*, plaintiffs contend, the *Oneok* claims were "'directed at practices affecting retail rates.'" *Id.* (quoting *Oneok*, 575 U.S. at 386). Adding those two together, plaintiffs assert their claims here are likewise "leveled at practices that caused hundreds of millions in *retail* rates that the plaintiffs are saddled with from background market conditions[.]" *Id.* at 36–37 (emphasis in original). But there's an important difference.

All the plaintiffs in *Oneok* were "direct-sales customers." 575 U.S. at 377. That is, all the *Oneok* plaintiffs bought natural gas directly from interstate pipelines to use it, not to resell it. So, as the Court explicitly noted, the "state antitrust lawsuits [at issue in *Oneok*] do not seek to challenge the reasonableness of any rates expressly approved by FERC." *Id.* at 389. Indeed, *Oneok* distinguished its holding from an earlier decision by explaining that "the state inquiry in [the earlier case] was pre-empted because *it was directed at jurisdictional sales* in a way that respondents' state antitrust lawsuits are not." *Id.* (emphasis added) (distinguishing between the

claims at issue in *Oneok* and those at issue in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)). That's not the situation in this case.

Here, all the gas purchases at issue occurred between natural gas companies and distributors, not end-line users. And plaintiffs' claims directly challenge the reasonableness of the rates and practices of those wholesale purchases, which fall under FERC jurisdiction. Plaintiffs contend that difference doesn't matter. Here's their argument:

> [T]he distinction that the claims in *Oneok* affected both regulated, wholesale rates and unregulated, retail natural-gas rates makes no difference. The Court in *Oneok* did not hold the plaintiffs' claims as to the regulated rates were preempted and the others were not—it held the Natural Gas Act did not preempt the plaintiffs' claims generally.

Doc. 56 at 38 (citations omitted).

But plaintiffs' characterization misapprehends the *Oneok* plaintiffs' position. Plaintiffs imply that the claims at issue in *Oneok* arose in the context of both regulated wholesale rates and unregulated retail rates. But they didn't. To be sure, the pipelines' behavior in *Oneok* "affected both federally regulated wholesale natural-gas prices and nonfederally regulated retail natural-gas prices." 575 U.S. at 376 (emphasis omitted). But that dual effect isn't surprising. Recall, the Supreme Court has explained that "the wholesale and retail markets . . . are inextricably linked[,]" *EPSA*, 577 U.S. at 265, and "state and federally regulated elements coexist within a single integrated system[,]" *Nw. Central Pipeline*, 489 U.S. at 515 (quotation cleaned up). So, it was no surprise to anyone that the pipelines companies' behavior affected both market segments. But the *Oneok* plaintiffs' claims arose in the context of direct-customer sales—the retail market—with consequences for the wholesale market. Plaintiffs' claims here are just the opposite.

They arise in the context of supplier-distributor sales—the wholesale market—with consequences for the retail market. And that difference places the *Oneok* plaintiffs' claims and plaintiffs' claims here in two different jurisdictional baskets—leading to a different preemption result. *Oneok* itself clarifies that the threshold question for preemption asks whether a matter falls within the preempted field. 575 U.S. at 385 ("[W]here (as here) a state law can be applied to nonjurisdictional as well as jurisdictional sales, we must proceed cautiously, finding preemption only where detailed examination convinces us that a matter falls within the pre-empted field as defined by our precedents."). After detailed examination, the court is convinced that the issue here—which turns on supplier-distributor sales—falls within the pre-empted field, even assuming those sales affected the retail market. Plaintiffs' reliance on *Oneok* is misplaced.[12]

This key distinction between plaintiffs' claims here and the *Oneok* claims also kneecaps plaintiffs' other *Oneok* argument, one premised on the broad applicability of the Kansas Consumer Protection Act.

### 3.    KCPA's Broad Applicability

Again citing *Oneok*, plaintiffs contend that the broadly applicable nature of the KCPA precludes a finding of preemption here. Doc. 56 at 37. Plaintiffs' argument stems from this passage in *Oneok*:

> To repeat the point we made above, no one could claim that FERC's regulation of this physical activity for purposes of wholesale rates forecloses every other form of state regulation that affects those rates. Indeed, although the dissent argues that *Schneidewind* created a definitive test for pre-emption in the natural gas context

---

[12]    The Tenth Circuit hasn't applied *Oneok* yet. But other courts interpreting *Oneok* have reached a similar conclusion about it as this Order reaches: when the claim or regulation at issue targets wholesale sales, *Oneok* dictates preemption. When wholesale sales are affected—but not targeted—*Oneok* doesn't require preemption. *See, e.g., Vill. of Old Mill Creek v. Star*, No. 17 CV 1163, 2017 WL 3008289, at *11 (N.D. Ill. July 14, 2017) ("Although the ZEC program will affect wholesale electricity rates, those rates were not its target; thus, the general rule supplied by *Oneok* (and *Northwest Central*) does not require preemption." (footnote omitted)), *aff'd sub nom. Elec. Power Supply Ass'n v. Star*, 904 F.3d 518 (7th Cir. 2018).

that turns on whether 'the matter on which the State asserts the right to act is in any way regulated by the Federal Act,' *Schneidewind* could not mean this statement as an absolute test. It goes on to explain that the Natural Gas Act does not pre-empt 'traditional' state regulation, such as state blue sky laws (which, of course, raise wholesale—as well as retail—investment costs). Antitrust laws, like blue sky laws, are not aimed at natural-gas companies in particular, but rather all businesses in the marketplace. They are far broader in their application than, for example, . . . regulations . . . which applied only to entities buying gas from fields within the State. This broad applicability of state antitrust law supports a finding of no pre-emption here.

575 U.S. at 386–87 (internal citations omitted). In essence, *Oneok*'s majority explained that the dissenters got it wrong because they interpreted the test for preemption too absolutely—allowing simply an *effect* on wholesale rates to usher in FERC preemption. *See id.* That is, broadly applicable state laws—think blue sky laws—necessarily affect the wholesale market. Blue sky laws raise both wholesale investment costs and retail costs. But FERC jurisdiction doesn't preempt a state's traditional regulation via blue sky laws simply because those laws also increase wholesale costs. That's because those blue sky laws don't take aim at FERC territory. Instead, they apply broadly in a way that inevitably affects wholesale sales in the larger, integrated market. In other words, this passage expresses the "aimed directly at" inquiry all over again. If a state's broadly applicable regulation *affects* wholesale sales (but doesn't *aim directly at* them) that *effect* doesn't call for preemption. The state can continue to employ its broadly applicable laws despite their wholesale effect. There's nothing new for plaintiffs to rest their caps.

Plaintiffs contend the KCPA, like the antitrust laws in *Oneok*, targets all businesses in the marketplace, not just natural gas companies. Doc. 56 at 37. And so, they assert, the NGA can't preempt the KCPA. *Id.* But broad application alone isn't the point. In *Oneok*, the state antitrust claims targeted problematic retail sales. And the broad application of those antitrust laws provided additional support to buttress the conclusion that their *aim* wasn't FERC-regulated wholesale sales. Here, though, the state KCPA claims *aim* directly at rates and practices in the

35

wholesale segment of the market.  The broad application of the KCPA can't save plaintiffs' claims from preemption, not when those claims themselves target wholesale rates and practices.[13]

To embrace plaintiffs' version of *Oneok* and their broad applicability argument would have significant consequences for both natural gas and electricity wholesale markets.  It would require participants in the wholesale market to evaluate *not only* whether their actions comply with FERC guidance, *but also* whether their actions might subject them to liability under state consumer protection, antitrust, blue sky, or other broadly applicable laws.  These considerations could constrain wholesale market participants in ways that could alter their activities dramatically.  That's not to say such constraint, in itself, is problematic.  But it necessarily would compete with and undermine FERC's role as the exclusive enforcer in those wholesale markets.  And that competition and interference is a result Congress explicitly aspired to avoid in the NGA.  *See* 15 U.S.C. § 717d(a) ("[T]he Commission shall determine the just and reasonable

---

[13]    A later Supreme Court case confirms the court must base its analysis on the "aimed directly at" inquiry applied here.  In *Hughes v. Talen Energy Mktg.*, decided one year after *Oneok*, the Supreme Court held a similar distinction determinative.  *Hughes* explained its holding this way:

> Our holding is limited:  We reject Maryland's program only because it disregards an interstate wholesale rate required by FERC.  We therefore need not and do not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, direct subsidies . . . . *measures untethered to a generator's wholesale market participation*.

*Hughes*, 578 U.S. at 166 (emphasis added).  That is, the Court didn't reject all state measures that might affect the wholesale market, just like *Oneok* didn't reject all broadly applicable state laws that might affect wholesale rates.  Instead, *Hughes* rejected only those measures tethered to wholesale market participation.  Here's the rub for plaintiffs—their state law claims sit precisely within *Hughes*'s narrow tethered space.  Plaintiffs' claims explicitly challenge wholesale rates (and defendants' practices when conducting wholesale sales).  That's FERC territory.  *Hughes* concluded by expressly permitting state measures "untethered to a generator's wholesale market participation" as not preempted.  *Id.*; *see also Elec. Power Supply Ass'n*, 904 F.3d at 523–24 (explaining *Hughes*'s "untethered" standard and finding zero-emissions credit system untethered when it "can influence the auction price only *indirectly*" (emphasis added)).  But plaintiffs' claims here are explicitly tethered ones—influencing wholesale markets *directly*—precisely as *Hughes* prohibited.

rate, . . . practice, or contract to be thereafter observed and in force, and shall fix the same by

order . . . the Commission may order a decrease where existing rates are unjust, unduly

discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.").

The court's conclusion here doesn't mean that plaintiffs seek to achieve illegitimate or

unimportant ends. They're neither. "But states may not seek to achieve ends, however

legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale

rates[.]" *Hughes*, 578 U.S. at 164. And it doesn't matter if those legitimate ends also implicate

traditional state functions.

In *Northern Natural Gas*, the Kansas Supreme Court had reasoned that conservation—

traditionally a function of state power—provided a reason for the Kansas Corporation

Commission to interfere with interstate pipeline companies' choice of purchase wells. 372 U.S.

at 93. The United States Supreme Court reversed, holding that "a purpose, however legitimate,

to conserve natural resources, does not warrant direct interference by the States with the prices of

natural gas wholesales in interstate commerce." *Id.*

Plaintiffs here don't assert state law claims to "regulate within the domain Congress

assigned to [states,]" claims which only "incidentally affect areas within FERC's domain."

*Hughes*, 578 U.S. at 164. Instead, plaintiffs' claims here "interfere with FERC's authority by

disregarding interstate wholesale rates[.]" *Id.* at 165. And even though plaintiffs' state claims

purport to function within the state's realm of "traditional authority over retail rates[,]" these

claims constitute an interference with wholesale transactions. *Id.* ("But *Mississippi Power &

Light* and *Nantahala* make clear that States interfere with FERC's authority by disregarding

interstate wholesale rates FERC has deemed just and reasonable, even when States exercise their

traditional authority over retail rates[.]").  The court thus holds that plaintiffs' state law claims are field preempted by exclusive FERC jurisdiction over wholesale sales.

The court's ruling nullifies any need to reach defendants' other arguments, *e.g.*, that the transactions here don't qualify as "consumer transactions" for the purposes of the KCPA or that the filed-rate doctrine bars three of the consolidated cases.  Also the court needn't reach defendants' individual Motions to Dismiss.

## VI.        Sealing Motions

As a final housekeeping matter, the court decides two sealing motions affiliated with the dismissal motions' briefing.

*First*, Defendant NextEra Energy Marketing, LLC moves to redact two exhibits (Doc. 13; Doc. 14) it filed with its independent Motion to Dismiss (Doc. 12).  NextEra reports that the redacted portions of both exhibits reveal non-public financial information that "concern transactions on pipelines not at issue in this litigation[.]"  Doc. 26 at 3.  And it contends that "[d]isclosure of this information would threaten NextEra's competitive interests, as it would provide competitors insight into NextEra's internal business operations, pricing practices, and customer base."  *Id.*  The motion is unopposed.  *Id.* at 1.

*Second*, defendants BP Energy Company and BP Canada Energy Marketing Corp. move to leave under seal Exhibit C (Doc. 98), filed in their Reply in Support of its Individual Motion to Dismiss (Doc. 97).  Doc. 108 at 1.  Exhibit C is a 10-page invoice for gas transactions between BP Energy defendants and KGS in February 2021.  The BP Energy defendants assert that "Exhibit C contains highly confidential information regarding BP's commercial transactions and non-public financial information" which "is exactly the type of sensitive financial and sales information that courts have determined warrants sealing."  *Id.* at 2, 4.  Plaintiffs oppose.  Doc. 113.  Plaintiffs argue, among other things, that the business information is "stale" at more than

three years old; that similar BP defendant information has sat unsealed on the docket without objection for months; and that other defendants in this action have disclosed this type of information. *Id.* at 1, 5. Taken together, plaintiffs suggest these circumstances cause BP's competitive interest threat to ring hollow. *Id.* at 1. BP defendants reply that this particular KGS invoice includes additional, nonpublic information not revealed elsewhere, including "the exact quantity of natural gas that KGS purchased from BP Energy at each delivery location" and "sensitive banking information, including BP Energy's account number." Doc. 115 at 1–2.

A "party seeking to file court records under seal must overcome a presumption, long supported by courts, that the public has a common-law right of access to judicial records." *Luo v. Wang*, 71 F.4th 1289, 1304 (10th Cir. 2023) (citation and internal quotation marks omitted). "The Court may order the sealing of documents if competing interests outweigh the public's interest." *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1343 (10th Cir. 2022). For example, the Tenth Circuit has allowed "sealing of documents reflecting a party's finances and business practices." *Id.* And our court has granted motions to seal "confidential business information or non-public financial information, including information about contract negotiations, pricing, profits, and sales strategy." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 WL 7396915, at *9 (D. Kan. Dec. 17, 2020); *see also AH Aero Serv., LLC v. Heber City*, No. 17-CV-01118-HCN-DAO, 2020 WL 6135819, at *5 (D. Utah Oct. 19, 2020) ("Confidential financial information is often sealed where its disclosure could cause competitive harm.") (collecting cases); *Melnick v. Tamko Bldg. Prods. LLC*, No. 19-CV-2630-JAR-BGS, 2023 WL 5574188, at *2 (D. Kan. Aug. 29, 2023) ("Such competing interests may include trade secrets to be protected from disclosure and confidential business information that may harm a business's competitive standing.").

39

NextEra's Unopposed Motion to Redact Certain Material (Doc. 26) is granted. NextEra provided chambers unredacted versions of Exhibit 1 and Exhibit 2, with proposed redactions highlighted in yellow. After review, the court concludes that the redacted information merits protection as confidential business and non-public financial information. And, because the redacted information pertains to transactions on pipelines not at issue here, restricting its access won't prevent the public from understanding the reasons for the court's decisions. NextEra filed the redacted versions provisionally under seal. The court directs the Clerk of the Court to unseal those redacted versions (Doc. 12; Doc. 13). The court also orders NextEra to file the unredacted versions under seal, thus maintaining a complete record.

Likewise, the BP Energy defendants' Opposed Motion to Seal (Doc. 108) is granted. BP defendants identify non-public information not revealed earlier in other BP filings or by other defendants. The type of information they identify meets our Circuit's standard for sealing. What's more, the court's disposition of this case doesn't require the public to have access to intimate details of the natural gas transactions between the BP defendants and KGS. Instead, the court rules that FERC, not plaintiffs, has exclusive jurisdiction to police these transactions. So, restricting access to this invoice won't prevent the public from understanding this court's reasoning.

## VII.    Conclusion

While one might take the length of this Order to suggest otherwise, the field preemption question presented here is straightforward. Plaintiffs' claims are aimed directly at transactions occurring in the wholesale natural gas market. Congress has designated FERC as having exclusive jurisdiction over the wholesale market. And Congress has granted FERC authority to enforce policies that police rates and market manipulation in that field. Plaintiffs' claims thus

fall into a field that Congress intended FERC and FERC alone to occupy. As a result, the NGA preempts plaintiffs' claims here. The court dismisses them with prejudice.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Joint Motion to Dismiss (Doc. 3) is granted. Plaintiffs' Complaints in all five consolidated actions are dismissed against all defendants in their entirety with prejudice. The court directs the Clerk of the Court to enter judgment for defendants against plaintiffs consistent with this Order.

**IT IS FURTHER ORDERED THAT** defendants' individual Motions to Dismiss are denied as moot. The court thus denies as moot defendants' BP Energy Company and BP Canada Energy Marketing Corp.'s Individual Motion to Dismiss (Doc. 5); Concord Energy LLC's Motion to Dismiss (Doc. 10); Spotlight Energy, LLC's Motion to Dismiss (Doc. 11); NextEra Energy Marketing, LLC's Motion to Dismiss (Doc. 12); CIMA Energy, L.P.'s Motion to Dismiss (Doc. 16); Williams Energy Resources, LLC's Motion to Dismiss (Doc. 17); Tenaska Marketing Venture's Motion to Dismiss (Doc. 20); and Macquarie Energy, LLC's Motion to Dismiss (Doc. 21).

**IT IS FURTHER ORDERED THAT** defendant NextEra Energy Marketing, LLC's Unopposed Motion to Redact (Doc. 26) is granted. The court directs the Clerk of the Court to unseal the redacted versions (Doc. 13; Doc. 14). The court also orders NextEra to file the unredacted versions under seal, thus maintaining a complete record.

**IT IS FURTHER ORDERED THAT** defendants BP Energy Company and BP Canada Energy Marketing Corp.'s Opposed Motion to Seal (Doc. 108) is granted. The court directs the Clerk of the Court to remove the provisional designation from Doc. 98, leaving Exhibit C permanently under seal in its entirety.

**IT IS SO ORDERED.**

Dated this 28th day of February, 2025, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge